United States District Court
Southern District of Texas
**ENTERED**
October 25, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BOBBIE ANN BROWN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-3265 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Defendant's Motion for Summary Judgment (Doc. 17) and Plaintiff's Motion for Summary Judgment (Doc. 21). The court has considered the motions, Defendant's response, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED**.

### I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 8, Ord. Dated Feb. 5, 2018.

A.  __Medical History__

Plaintiff was born on December 16, 1963, and was fifty years old on the alleged disability onset date of January 24, 2014.[2]

In February 2012, Plaintiff suffered "a knee injury as the result of an automobile accident that occurred while she was working. . . . Since that time[,] she has had injuries to both knees, her right shoulder and the right wrist."[3]  Plaintiff presented to Cypress Orthopedics, Sports & Spine ("Cypress Orthopedics") for a full orthopedic evaluation less than one week after the accident.[4]  According to the medical record, Plaintiff returned to Cypress Orthopedics several times thereafter for treatment of her injuries.[5]

In June 2012, Plaintiff underwent a endoscopic carpal tunnel release on her right wrist performed by Robert S. Bell, M.D., ("Dr. Bell") of Cypress Orthopedics.[6]  Plaintiff continued to received treatment at Cypress Orthopedics for her other injuries and attended physical therapy ("PT") sessions.[7]  As of December 2013,

---

[2]     See Doc. 11, Tr. of the Admin. Proceedings ("Tr.") 124, 228.

[3]     Tr. 285; see also Tr. 419.

[4]     See Tr. 419.

[5]     See, e.g., Tr. 415-21.

[6]     Tr. 412-13.

[7]     See, e.g., Tr. 287-92, 352-56, 362-63, 369-70, 378-82, 410-11.

2

Plaintiff's wrist "ha[d] done well."[8]  However, on January 10, 2014, Plaintiff reported that she was experiencing "some flareup of her right carpal tunnel symptoms," which, according to the physician assistant who saw Plaintiff, is "unusual after surgery."[9]

Eight days prior the alleged onset date of January 24, 2014, Plaintiff underwent surgery for a left total knee replacement performed by Dan K. Eidman, M.D., ("Dr. Eidman").[10]  At a PT re-assessment on February 13, 2014, Plaintiff reported no new complaints and that therapy was "going well."[11]  However, Plaintiff's surgical wound subsequently reopened and, from March 20 to May 30, 2014, she received treatment at St. Luke's Center for Wound Care.[12]  According to the record, Plaintiff resumed PT on her knee in April 2014 and received up to three PT sessions per week until at least February 2016.[13]

On July 3, 2014, Daryl K. Daniel, M.D., ("Dr. Daniel") performed a consultative examination of Plaintiff.[14]  As Plaintiff's chief complaints, Dr. Daniel identified issues with both knees, right shoulder, elbow, and wrist, all of which Plaintiff traced to

---

[8]    Tr. 285.

[9]    Tr. 284.

[10]   See Tr. 294-305.

[11]   Tr. 425.

[12]   See Tr. 307-09, 428-30, 565-602.

[13]   See Tr. 337-39, 341, 364-65, 372-77, 454-564.

[14]   See Tr. 399-403.

3

the 2012 automobile accident.[15]   Plaintiff indicated that she did
not use a cane, crutch, or walker.[16]   Plaintiff stated that she was
continuing PT and receiving injections in her right knee.[17]   With
regard to her capabilities, Plaintiff reported that she could walk
only as far as the parking lot, stand about two minutes, and lift
about ten pounds and that she avoided stairs.[18]

On physical examination, Dr. Daniel recorded predominately
normal results with the following particularly relevant notes:

> Cranial nerves II through XII[] and deep tendon reflexes
> are grossly normal.  Sensory examination is noted to be
> adequate in the upper and lower extremities.  Gait is
> slow with an extremely heavy left-sided limp (attempts to
> not bear weight on left leg)[.] Noted problems standing
> from a sitting to a standing position.  Hand
> grip/strength is 5/5 on the right and 5/5 on the left.
> Lower extremity strength is 5/5 on the right and 3/5 on
> the left with knee raises and leg extensions.  Straight
> leg raises are positive at 80 degrees on the right and 60
> on the left, while in the supine position.  Claimant can
> effectively bend over 40 degrees with an attempt to touch
> toes.  Claimant can walk on toes[] and heels and is not
> able to squat on today with support of exam table in the
> room.[19]

Radiologic studies of the knees revealed "[n]ormal appearance of
the knee prosthesis" on the left and moderate degenerative changes

---

[15]   See Tr. 399.

[16]   See id.

[17]   See id.

[18]   See id.

[19]   Tr. 400.

on the right.[20]

On July 23, 2014, Dr. Eidman completed an insurance claim form for continuing disability in which he opined that Plaintiff had not progressed since her total knee replacement and was permanently disabled.[21] Four months later, Dr. Eidman indicated on a return-to-work form that Plaintiff was unable to work at that time.[22] He provided no other information.[23] Dr. Eidman completed the same form in the same fashion on January 27, 2015, April 6, 2015, May 19, 2015, July 21, 2015, September 28, 2015, December 9, 2015, February 16, 2016, and April 19, 2016.[24] When the completion of these forms coincided with an appointment, Dr. Eidman's office notes contained very little information (most of which was illegible).[25]

In a typed office note dated April 6, 2015, Dr. Eidman reported that Plaintiff was experiencing pain and swelling in her knee exacerbated by "any repetitive kneeling or squatting" and that she presented with "significant restriction of motion in her left knee."[26] His treatment plan was to continue medications and PT and to prescribe a Neuromuscular Electrical Nerve Stimulator (NMES) and

---

[20]     Tr. 401.

[21]     See Tr. 432.

[22]     See Tr. 434.

[23]     See id.

[24]     See 435-36, 438, 440, 442-44, 447.

[25]     See Tr. 433, 437, 439, 441.

[26]     Tr. 445.

Transcutaneous Electrical Nerve Stimulator (TENS) unit.[27]

On December 2, 2015, Dr. Bell saw Plaintiff for "a second opinion regarding the healing from her surgery" in light of her surgeon's finding that the x-rays were stable and recommending only PT.[28]  Dr. Bell stated, "[Plaintiff] underwent a left knee replacement in mid January 2014[,] and we have not seen her since [before] that surgery."[29]  Dr. Bell provided a summary of Plaintiff's treatment since her last encounter with him, seemingly based on Plaintiff's self-report.[30]  Plaintiff's "worst problem," according to Dr. Bell's report, was that, "when she g[ot] up from a sitting position[,] she ha[d] a cramping pain in that she fe[lt] that something shift[ed] and then she [was] able to move after 2-3 minutes but she [could not] get up and walk until that cramping and that shifting occur[red]."[31]  Plaintiff also reported that she was experiencing constant pain in her left knee upon weight bearing.[32]

Dr. Bell's examination revealed "a widened scar due to the delayed healing," extension capability to -8 degrees, flexion capability to 90 degrees, a maltracking patella, and "considerable

---

[27]    See id.

[28]    Tr. 405.

[29]    Id.

[30]    See id.

[31]    Id.

[32]    See id.

weakness" of the left thigh muscle that extends the knee.[33]   In addition to maltracking of the kneecap, radiologic studies exposed what appeared to be "a laterally dislocated kneecap and some questionable loosening of the tibial component of the knee prosthesis."[34]  Dr. Bell told Plaintiff that "the symptoms of her difficulty standing and . . . walking" were caused by the patellar malalignment and that the cramping and shifting resulted from "the kneecap trying to go into correct position."[35]

Dr. Bell opined that Plaintiff would not improve any further with conservative treatment and "need[ed] a revision of her knee replacement to include correction of the patellar maltracking and possibly the tibial component if it is found to be loose at the time of surgery."[36]  Dr. Bell referred Plaintiff to another doctor for a second opinion regarding corrective surgery.[37]

On June 2, 2016, Dr. Eidman wrote a letter "To Whom It May Concern" stating that he had treated Plaintiff since October 22, 2013, for issues with her right shoulder and both knees.[38]  He stated that she was undergoing physical and aqua therapy, that she

---

[33]   See id.

[34]   Id.

[35]   Tr. 406.

[36]   Id.

[37]   See id.

[38]   Tr. 626.

needed a functional capacity evaluation, and that she possibly needed to "undergo manipulation of her left knee under anesthesia."[39]

> According to Dr. Eidman:
>
> The patient's current restrictions include no carrying/lifting more than 10 pounds on a frequent basis. She is restricted to no frequent bending, stooping, kneeling, or squatting. She is unable to maneuver up and down stairs without significant pain. With her right shoulder[,] she is unable to repetitively push or pull. She is currently able to stand/walk less than two hours in an eight[-]hour day and sit less than four hours in an eight[-]hour day. [Plaintiff's] orthopedic injuries limit her function[,] and her limitations include no lifting over 10 pounds, no repetitive kneeling, squatting, stooping, or bending. She is unable to sit, stand, or walk for prolonged periods. [Plaintiff] takes required prescribed medication that has side effects and limit[s] her functionality.[40]

Dr. Eidman opined that Plaintiff was "unable to be gainfully employed because of disabling symptoms" and remained "100% totally disabled and unemployable."[41]

## B. **Application to SSA**

Plaintiff reapplied for disability insurance benefits after the issuance of an unfavorable ALJ decision on January 23, 2014.[42] In the new application of April 2, 2014, Plaintiff alleged a disability onset of January 24, 2014, due to impairments of both

---

[39]     Id.

[40]     Id.

[41]     Tr. 626-27.

[42]     See Tr. 23.

knees, right shoulder, elbow, and wrists.[43]

In a May 2014 function report, Plaintiff stated that knee pain prevented her from bending, standing, and walking and that right wrist post-surgery pain prevented her from lifting more than five to ten pounds.[44]  She reported that, due to pain in her knees, she did "nothing" all day other than "sitt[ing] up a little" and spending "most of the time" in bed.[45]  At that time, the wound from knee surgery had reopened, which allowed her only three hours of sleep every day and interfered with her ability to care for her own personal needs, cook, housework, and other daily activities.[46]  Plaintiff reported relying on an assistive ambulatory device.[47]

Later in the process, Plaintiff reported that her medical condition was worse.[48]   She described her impairments as "continu[ing] pain in both knees, stiffness[, and] pain in [her] right shoulder, and pain, cramping, numbness[, and] tingling in [her] right hand[.]"[49] Plaintiff listed the following limitations: (1) an inability to sit, stand, or walk for more than a short time; (2) an inability to bend or kneel on her right knee; (3) a limited

---

[43]   <u>See</u> Tr. 124, 228-29, 239.

[44]   <u>See</u> Tr. 249.

[45]   Tr. 250.

[46]   <u>See</u> Tr. 250-54.

[47]   <u>See</u> Tr. 252, 254.

[48]   <u>See</u> Tr. 270.

[49]   <u>Id.</u>

ability to climb stairs; (4) an inability to lift or carry more than about five pounds; (5) a limited ability to reach due to pain; and (6) a limited ability to grasp, hold items, write, and type with her right hand.[50]  By the time of that report, Plaintiff was still having difficulty caring for her personal needs, especially bathing, dressing, and fixing her hair and was still spending a lot of time lying down to rest her knee.[51]

On July 11, 2014, the SSA found Plaintiff not disabled at the initial level of review.[52]  On September 19, 2014, Plaintiff completed a disability report and described her condition as "worsening bi-lateral knee pain; continued stiffness and pain in right shoulder, continued right hand problems[,] including pain, cramping, tingling[,] and numbness[.]"[53] She reported being capable of "very limited standing/walking, sitting at one time," being incapable of bending her right knee at all, being "unable to lift/carry more than 5 pounds; having "trouble bending, kneeling, squatting[,] and climbing stairs; and having "trouble using [her] right hand—gripping, holding onto things, writing[.]"[54] According to Plaintiff, her children prepared her meals, helped with

---

[50]    Id.

[51]    See Tr. 273.

[52]    See Tr. 123-31, 143-47.

[53]    Tr. 604.

[54]    Id.

household chores, and assisted with certain personal-hygiene tasks.[55]   Plaintiff stated that, other than therapy, she spent her time watching television and lying down.[56]

On October 14, 2014, the SSA again found Plaintiff not disabled upon reconsideration.[57]   Plaintiff requested a hearing before an ALJ.[58]   The ALJ granted Plaintiff's request and scheduled the hearing on April 21, 2016.[59]

## C.  **Hearing**

At the hearing, Plaintiff and a vocational expert testified.[60] Upon questioning by the ALJ, Plaintiff addressed the diagnosis of and surgery for carpal tunnel and the total left knee replacement.[61] Regarding the knee surgery, Plaintiff testified that she received wound care treatment for six months.[62]   Plaintiff admitted that another surgery was recommended but that she was afraid to undergo another one because of the reopening of the wound after the first surgery.[63]   Plaintiff also reported that she continued in PT for

---

[55]   See Tr. 608-09.

[56]   See Tr. 609.

[57]   See Tr. 132-41, 149-53.

[58]   See Tr. 155.

[59]   See Tr. 41, 168-73.

[60]   See Tr. 41-106.

[61]   See Tr. 46-48.

[62]   See Tr. 47.

[63]   See Tr. 48.

11

both knees and her right shoulder three times a week for two to three hours each session and had been doing so for nearly two years.[64]

Plaintiff's attorney questioned Plaintiff about her impairments.[65] Plaintiff spoke mostly about numbness and tingling in her right hand, which she opined would interfere with her ability to perform clerical tasks.[66] Regarding depression, Plaintiff testified that her orthopedic doctor suggested that she see her primary care physician for that, but she had not done so.[67]

Plaintiff described her prior work at a hospital where she registered patients at the emergency room, initially reporting that she spent two hours sitting and six hours standing.[68] However, she described her tasks as sitting for about twenty minutes at a time to register a patient and then walking for about five minutes to pick up the paperwork and escort the patient to a room.[69]

The vocational expert classified Plaintiff's prior jobs of mail carrier and director of admissions, finding the first to be semiskilled performed at the medium exertional level and the second

---

[64]    See Tr. 49, 57-58.

[65]    See Tr. 54-62.

[66]    See Tr. 56-60.

[67]    See Tr. 61.

[68]    See Tr. 50.

[69]    See Tr. 49-51.

to be semiskilled performed at the sedentary exertional level.[70]
The ALJ posed a hypothetical right-hand-dominant, high-school-educated individual of the same age and vocational background as
Plaintiff with: (1) the ability to stand and walk for four hours
and sit for four hours out of an eight-hour workday; (2) the need
to change positions at will; (3) the ability to lift and carry or
push and pull a maximum of ten pounds; (4) the inability to use
ropes, ladders, or scaffolds; (5) the restriction of occasional for
other postural requirements; (6) the inability to reach overhead on
the right; (7) the ability to frequently engage in fine and gross
manipulation on the right.[71]  The vocational expert opined that such
an individual could perform Plaintiff's prior work as an admissions
director.[72]

**D.  <u>Work Assessment Report</u>**

A few days shy of three weeks after the hearing, a vocational
evaluator and a rehabilitation consultant assessed Plaintiff's
ability to perform work.[73]  In addition to a review of Plaintiff's
medical history, their report included the following list of
Plaintiff's "[p]erceived [l]imitations:"

> physical limitations in bending, kneeling,
> squatting/crouching, crawling, pushing/pulling, reaching,

---

[70]    <u>See</u> Tr. 63.

[71]    Tr. 63-64.

[72]    <u>See</u> Tr. 64.

[73]    <u>See</u> Tr. 617-622.

> twisting, climbing, balancing, and using right
> hand/fingers[;] . . . pain to her bilateral knees, right
> shoulder and right hand 100% of the time; [increased
> pain] with prolonged sitting/standing and continuous use
> of her right hand[;] . . . [and] problems with dizziness,
> nausea, and depression.[74]

The evaluators also included Plaintiff's education and past job duties.[75]

The evaluation of Plaintiff's ability to work took place over two days and included testing of Plaintiff's tolerances and/or capabilities for sitting, standing, lifting, carrying, walking, climbing, reaching, handling, fingering, hearing, seeing, and speaking.[76]   The evaluators also tested Plaintiff's clerical and manual abilities.[77]   Plaintiff demonstrated poor skills and complained of significant pain in all testing.[78]   The evaluators opined:

> Thus, evaluation results indicate that this client cannot
> perform work.  Her physical capacity assessment indicates
> that the client cannot perform work at the sedentary
> level, has significant limitations with the use of her
> hands/fingers and has questionable tolerance to pursue a
> 40 hour work week.  In addition, due to significant pain
> behaviors[,] the client was unable to maintain focus and
> concentration which appeared to affect her overall work
> performance and appear to support the client's inability

---

[74]    Id.

[75]    See Tr. 618-19.

[76]    See Tr. 619-20.  Plaintiff drove herself to the evaluation on the first day but left after approximately two hours due to knee pain.  See Tr. 619.

[77]    See Tr. 620-21.

[78]    See Tr. 619-22.

14

to perform any work at this time.[79]


E.  **Commissioner's Decision**

On July 7, 2016, the ALJ issued an unfavorable decision.[80]  The ALJ found that Plaintiff had not engaged in substantial gainful activity since January 24, 2014, the alleged onset date.[81]  The ALJ recognized the following impairments as severe: "osteoarthritis and degenerative joint disease; status post total knee replacement; carpal tunnel syndrome."[82]  The ALJ did not find right elbow, right hip, or depression issues to be medically determinable impairments.[83]  He further found medically determinable impairments to Plaintiff's right knee and right shoulder that were not severe.[84] Although not finding weight to be a medically determinable impairment, the ALJ did take it into consideration in evaluating Plaintiff's symptoms.[85]

The ALJ provided a substantial overview of Plaintiff's medical

---

[79]     Tr. 622.

[80]     Tr. 17-40.

[81]     See Tr. 22.

[82]     Tr. 23.

[83]     See Tr. 30-31.

[84]     See Tr. 31.

[85]     See Tr. 30.

history and treatment prior to January 24, 2014, which included the "[o]rigin or [d]iscovery" of her impairments following the automobile accident on February 22, 2012, and the total knee replacement on January 16, 2014.[86]  The ALJ noted, "What matters for the claimant in this proceeding are the later effects of her injuries and her surgeries, about which the medical evidence, give[n] the claimant's allegations and written and testimonial evidence, is surprising[ly] sparse."[87]   The ALJ described Plaintiff's medical treatment since the current alleged onset date as "essentially [PT] and medications" for her left knee.[88]

The ALJ thoroughly discussed Plaintiff's post-operative PT and doctor visits related to her left knee, as well as two months of wound care necessitated by a "signal post-operative problem" of the reopening of her surgical wound in March 2014.[89]  The ALJ cited a notation from a June 2014 PT session indicating that the wound had healed completely.[90]  "Though the experience of her wound being open and requiring wound care was no doubt unpleasant," the ALJ wrote, "the documented span of treatment for that opening wound was less

---

[86]    See Tr. 23, 25-27.

[87]    Tr. 23.

[88]    Tr. 31.

[89]    Tr. 28; see also Tr. 27-31.

[90]    See Tr. 28.

than 3 months, not the 6 months to which the claimant testified."[91] Additionally, the ALJ recorded Plaintiff's subjective reports to her physicians and their clinical impressions.[92]

Regarding a July 2014 consultative examination by Dr. Daniel and associated radiology, the ALJ recited Dr. Daniel's clinical impressions :

> left knee arthralgia due to history of surgery, with right knee degenerative arthritis; limited functional capacity, secondary to recent knee surgery and associated pain; right shoulder fracture, with arthritis; history of right hand fracture with chronic arthralgia; tendonitis of the right elbow . . . .

The ALJ "note[d] Dr. Daniel made no abnormal finding about the claimant's right elbow in his physical examination" and "that Dr. Daniel did not mention the claimant's surgical wound being open or under treatment at the time of the examination."[93]

The ALJ reviewed all of Dr. Bell's examination results and pointed out that, at the time, Dr. Bell had not seen Plaintiff since before her knee surgery almost two years earlier.[94]  The ALJ included Dr. Bell's assessment that Plaintiff would not likely improve with continued conservative means but, rather, would need corrective surgery.[95]  After that appointment, the ALJ also noted,

---

[91]    Tr. 31.

[92]    See Tr. 27-29.

[93]    Tr. 24; see also Tr. 23.

[94]    Tr. 29.

[95]    See id.

Plaintiff spoke with other doctors about a second surgery but did not follow through with it due to fear.[96]  The ALJ found fear to be a legitimate reason for not undergoing corrective surgery.[97]

The ALJ identified a lack of consistency between Plaintiff's subjective complaints and the medical record regarding Plaintiff's complaints about continuing symptoms of carpal tunnel.[98]  He also discounted Dr. Daniel's consideration of a right shoulder fracture with arthritis because Plaintiff's self-report was the only source of that diagnosis and, in fact, did not "accord with the other medical evidence which emphatically did not find any shoulder fracture."[99]

Discussing Dr. Eidman's medical opinions that Plaintiff was permanently disabled, the ALJ gave them little weight because Dr. Eidman provided unsatisfactory explanations, relying only on the fact that Plaintiff underwent a total knee replacement.[100]  The ALJ wrote, "The mere fact of having a total knee replacement does not cause functional limitations after the recovery from surgery; if it did so, no one would have such surgery, which is, after all,

---

[96]     See id.

[97]     See Tr. 37.

[98]     See Tr. 29-30.

[99]     Tr. 30.

[100]    See Tr. 33.

intended to restore function."[101]   The ALJ also provided a lengthy discussion of Dr. Eidman's evaluation of Plaintiff's RFC, which the ALJ gave "only some small weight" because Dr. Eidman's opinions were not supported by his treatment notes.[102]

The work assessment report completed after the hearing was also discredited by the ALJ, who found that Plaintiff's complaints of pain and poor test performance were "not consistent with the medical evidence of her actually medically determinable impairments."[103]   The ALJ gave some weight to the report as it related to Plaintiff's left knee and "some weight, though not as much, to the other conclusions" in the work assessment.[104]   The ALJ disagreed with the report's conclusions about Plaintiff's endurance, noting that, because "the bases for the examiners' assessments [we]re the claimant's subjective reports and behaviors the performance of which [we]re within her control," he could not "avoid some consideration of secondary gain being part of the claimant's presentation."[105]

The ALJ devoted three pages to the evaluation of Plaintiff's

---

[101]    Id.

[102]    See Tr. 34.

[103]    See Tr. 35.

[104]    Id.

[105]    Id.

symptoms.[106]  Except for Plaintiff's complaints resulting from the open wound that healed in a matter of months, the ALJ found that Plaintiff's "impairments could reasonable be expected to cause the claimant's complained of symptoms, sometimes[] and at some level."[107]  However, in the ALJ's opinion, Plaintiff's assertions about the intensity, persistence, and limiting effects of her symptoms were not fully consistent with the record as a whole.[108] The ALJ explained that, although Plaintiff received PT for her knee, Plaintiff did not seek any other treatment for it or for any other impairment and that, although Dr. Eidman stated that Plaintiff had prescribed medications that caused side effects, he failed to identify those medications or their limiting effects.[109]

At the Listing[110] step, the ALJ found that Plaintiff did not meet the requirements of any Listing, specifically addressing Listings 1.02 (major dysfunction of a joint) and 11.14 (peripheral neuropathy) regarding Plaintiff's left and right knees, right shoulder, and right wrist and hand.[111]  The ALJ cited notes from PT, Dr. Bell, and Dr. Daniel, as well as the work assessment report, as

---

[106]    See Tr. 36-39.

[107]    Tr. 37.

[108]    Tr. 38.

[109]    See id.

[110]    This refers to the list of disorders in the regulations that are considered disabling.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[111]    See Tr. 32.

evidence that Plaintiff did not use a handheld assistive device to ambulate and, thus, did not meet the Listing requirements for her left knee.[112]   The ALJ also relied on the Listing determinations made by Laurence Ligon, M.D., and Randal Reid, M.D., on initial review and on reconsideration, respectively.[113]

The ALJ found Plaintiff capable of performing:

> less than the full range of sedentary work . . . in that she can stand and can walk for 4 hours and can sit for 4 hours in the usual work day, with normal breaks, and she can lift and can carry 10 [pounds] both occasionally and frequently, with pushing and pulling the same; she requires a sit-stand option, to change positions at her will; she can occasionally climb stairs and ramps, but never ropes, ladders or scaffolds; she can occasionally balance, stoop, kneel, crouch and crawl; she can reach in any direction, except she may never reach overhead with her right arm — noting she is right hand dominant; she can handle and can finger for both fine and gross manipulation frequently.[114]

The ALJ found that Plaintiff's RFC did not preclude her from performing her past relevant work as a hospital director of admissions.[115]   In reaching that conclusion, the ALJ relied on the hearing testimony of the vocational expert, who found nothing in Plaintiff's RFC that would prevent her from performing that job.[116] The ALJ found Plaintiff's testimony unreliable due to

---

[112]     See id.

[113]     See Tr. 32, 128, 137.

[114]     Tr. 32-33.

[115]     See Tr. 39.

[116]     See id.

inconsistencies regarding the amount of time she spent sitting versus walking or standing in her past position.[117]   The ALJ concluded that Plaintiff was not disabled at any time from the alleged onset date for the current application to the date of the ALJ's decision.[118]

On September 7, 2016, Plaintiff appealed the ALJ's decision.[119] On August 24, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[120]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[121]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the

---

[117]   See id.

[118]   See Tr. 40.

[119]   See Tr. 227.

[120]   Tr. 1-5.

[121]   See Doc. 1, Pl.'s Compl.

ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

<u>Bowling v. Shalala</u>, 36 F.3d 431, 435 (5th Cir. 1994); <u>see also</u> 20

C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits, asserting that the ALJ's decision contains one error: it is not supported by substantial evidence. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

In her motion, Plaintiff generally discusses her medical history but focuses on the December 2015 evaluation by Dr. Bell, which she quotes in its entirety. She also provides a lengthy quote from the ALJ's decision, about which she comments that the "ALJ differed with Dr. Bell concerning the length of recovery regarding her post surgical wound; however, [the ALJ] acknowledged [Plaintiff's] profound limitations in his decision regarding her left knee."[122]   Plaintiff argues that, despite the acknowledgment that the "total knee replacement surgery had failed," the ALJ incorrectly concluded that Plaintiff could stand and walk for up to four hours per eight-hour workday, which led to "the ALJ's erroneous conclusion that [Plaintiff] could simply return to her prior relevant work as a 'hospital director of admissions.'"[123] Plaintiff contends that "[t]he medical facts belie this ruling" but points to no portions of the record in support of that statement. Plaintiff concludes her motion with several factually unanchored statements, such as: (1) "Since Defendant failed to fully consider

---

[122]   Doc. 21, Pl.'s Mot. for Summ. J. p. 9 (citing Tr. 37).

[123]   Id. p. 10.

all of the evidence, error was committed[;]" and (2) "Defendant's ALJ cannot 'pick and choose' only the evidence that suits him."[124]

To the extent that Plaintiff is asserting that the ALJ did not fully consider Dr. Bell's December 2015 assessment, that assertion is belied by the ALJ's devotion of nearly a page to Dr. Bell's examination report, which was equivalent in length to Dr. Bell's discussion of his examination results and treatment recommendations.  The ALJ sufficiently discussed Dr. Bell's report and accepted Dr. Bell's explanation that Plaintiff's experience of cramping and shifting was due to patella maltracking, his opinion that she would not show further improvement with conservative means, and his recommendation that she seek corrective surgery. The ALJ even found Plaintiff's reasons for not following through on Dr. Bell's recommendation to be justifiable.  The only point of disagreement concerned Plaintiff's self-report of the length of treatment for the reopened wound, which the ALJ found to be inconsistent with the medical record.

Moreover, the ALJ provided thorough discussions of Plaintiff's pre-onset injuries, Dr. Daniel's consultative examination, Dr. Eidman's surgery and post-surgery treatment, wound care after the incision reopened, and continuing PT.  The ALJ coupled his consideration of the medical evidence with detailed evaluations of the medical opinions, explaining what weight he gave to each.  See

---

[124]    Id.

20 C.F.R. § 404.1527(c) (explaining that every medical opinion is to be evaluated and weight given in consideration of the relationship with the patient, supportability, consistency, and other factors). The ALJ paid particular attention to Dr. Eidman's repeated statements that Plaintiff was disabled, discrediting them to the degree that they were not supported by or consistent with the medical record. See 20 C.F.R. § 404.1527(c) (listing supportability and consistency as factors for consideration); § 404.1527(d) (explaining that whether an individual is disabled is a determination reserved to the Commissioner and opinions on these issues are not given any special consideration).

The ALJ also explained the weight given to the Work Assessment Report, a nonmedical source, which he accorded some weight despite the inherent influence of secondary gain on Plaintiff's performance. See 20 C.F.R. § 404.1527(f) (explaining that nonmedical opinions are considered using the same factors as for medical opinions, where applicable); 20 C.F.R. § 404.1513(a)(4) (defining nonmedical sources). Finally, the ALJ discussed the weight given Plaintiff's testimony, noting discrepancies between the descriptions of her degree of physical limitation and the medical record and inconsistencies throughout the administrative process in her descriptions of her past work duties. See 20 C.F.R. § 404.1529(c) (stating that the ALJ evaluates the intensity and persistence of the claimant's symptoms to determine how they limit

27

her capacity to work); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1024 (5th Cir. 1990)(stating that the court must give deference to the ALJ's evaluation of the plaintiff's subjective complaints when supported by substantial record evidence).

The ALJ did exactly what he was required to do.  He thoroughly discussed the medical and nonmedical evidence, explained the weight given every portion of the record, and cited substantial evidence in support of his conclusions.  Ultimately, the ALJ bears the responsibility for determining the individual's RFC.  <u>See</u> 20 C.F.R.

§ 404.1527(d)(2); <u>Taylor v. Astrue</u>, 706 F.3d 600, 602-03 (5th Cir. 2012).

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such

objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 25th day of October, 2018.


_____
U.S. MAGISTRATE JUDGE